IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID TEETER, | : | |
| Plaintiff, | : | 1:19-cv-1247 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JEFF BOLAND and KEVIN KOLLMAN, | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM**

**February 18, 2021**

## **I.    BACKGROUND**

Plaintiff David Teeter ("Teeter"), at the relevant time, a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC") incarcerated at the State Correctional Institution at Benner Township ("SCI-Benner Township"), Bellefonte, Pennsylvania, commenced this action on July 19, 2019, pursuant to 42 U.S.C. § 1983.  (Doc. 1).  Teeter, who has been diagnosed with Gender Dysphoria ("GD"), and identifies as a female, alleges that Defendants Jeff Boland ("Boland") and Kevin Kollman ("Kollman") acted with deliberate indifference to her serious medical needs in violation of the Eighth Amendment right to adequate medical care.  She essentially alleges that Defendants violated the Eighth Amendment by changing her estrogen dosage "without warning or consultation" and violating the "current policy issued by the Pennsylvania Department of Corrections, which

requires the use of the [World Professional Association for Transgender Health] ["]WPATH["] for treatment of identified inmates." (Doc. 1, p. 6, ¶ 40). She avers that UpToDate software relied upon to adjust her estrogen dosage, "has no relation to WPATH" and the "use of software other than WPATH violates the current policy." (*Id.* at ¶¶ 26-28). She also sets forth state law claims of negligence and intentional infliction of emotional distress based on this conduct.

Presently pending are motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, filed by Defendant Kollman (Doc. 36) and Defendant Boland (Doc. 45). Both motions are accompanied by supporting briefs (Docs. 39, 46) and Statements of Material Facts (Docs. 36-1, 47).

On September 24, 2020, an Order issued affording Teeter until November 13, 2020, to file opposition briefs and Statements of Material Facts in accordance with Local Rule 56.1.[1] (Doc. 48). The Court cautioned her that the failure to adhere to the deadlines would result in the statements of material facts being deemed admitted and the motions being deemed unopposed. She failed to respond. Consequently, the Statement of Material Facts are deemed admitted and the

---

[1] Local Rule 56.1 states that "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the moving party], as to which it is contended that there exists a genuine issue to be tried… All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." *See* L.R. 56.1

motions are deemed unopposed. For the reasons set forth below, the motions will be granted.

## II. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008).  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at

4

323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

## III. STATEMENT OF MATERIAL FACTS

### A. DOC Policy and GD Standards of Care Guidance

DOC policy 13.2.1, Access to Health Care Procedures Manual, Section 19, Diagnosis and Treatment of Gender Dysphoria, outlines the guidelines to be followed for the treatment of inmates diagnosed with GD. (Doc. 36-1, ¶ 41; Doc. 47, ¶ 30). Section 19 D. states, "[t]he latest version of Standards of Care for the Health of Transsexual, Transgender, and Gender-Noncomforming People, published by the World Professional Association for Transgender Health (WPATH), will serve as guidelines for the overall health care of identified inmates." (*Id.*; *Id.*).

WPATH's Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming people does not provide specific hormone dosing guidelines. (*Id.* at ¶ 42; *Id.* at ¶ 30). WPATH's guidelines state, "To date, no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate safety or efficacy in producing physical transition. As a result, wide variation in doses and types of hormones have been published in the medical literature. In addition, access to particular medications may be limited by a patient's geographical location and/or social or economic situations. For these reasons, WPATH does not describe or endorse a particular

6

feminizing/masculinizing hormone regimen. Rather, the medication classes and routes of administration used in most published regimens are broadly reviewed." WPATH "strongly recommend[s] that hormone providers regularly review the literature for new information and use those medications that safely meet individual patient needs with available local resources." (Doc. 36-1, ¶¶ 44, 45; Doc. 47, ¶¶ 39-41). "The SOC [standards of care] are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender-nonconforming people." (Doc. 47, ¶ 40). "The criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them." (*Id.*).

"UpToDate will serve as guidelines for the specific medical treatment of inmates who require hormone therapy. UpToDate is a propriety online software program that is nationally recognized for providing evidence-based and peer-reviewed medical information." (Doc. 36-1, ¶ 42; Doc. 47, ¶ 30). Pursuant to 13.2.1, Section 19 H. 5., the Site Medical Director, "shall utilize UpToDate (or alternate source of medical information approved by the Bureau of Health Care Services (" BHCS")) for clinical guidance in selecting medications and dosages." (Doc. 47, ¶ 31). Up-to-Date recommended Estradiol valerate dosing between 5 mg

7

and 30 mg every two weeks. Moreover, Up-to-Date states that, "Serum estradiol should not exceed the peak physiologic range: 100 to 200 pg/mL." (Doc. 36-1, ¶¶ 46, 47).

### B. Corrections Health Care Administrator

Defendant Boland is a registered nurse serving in the administrative role as the Corrections Health Care Administrator ("CHCA"). (Doc. 47, ¶ 8). He does not have the ability to prescribe medication or to alter the medications prescribed by a physician and is not directly involved in the day-to-day medical care of the inmates at SCI-Benner Township. (Doc. 47, ¶¶ 9, 10).

According to policy 13.2.1, Section 19, J, the CHCA's role, with respect to inmates diagnosed with GD, is to compile evaluations conducted by psychology, psychiatry, and medical staff regarding an inmate's GD diagnosis and forward the information to the BHCS. (*Id.* at ¶ 32). The CHCA also forwards inmates' individual recovery plan packets to the Gender Dysphoria Treatment Review Committee and receives them back at the institution following the Committee's review. (*Id.*).

The policy further indicates that inmates diagnosed with GD shall be seen by the Site Psychiatrist every 90 days and by the LPM/LP/PSS every 30 days, or more frequently if clinically indicated. (*Id.* at ¶ 33). Inmates diagnosed with GD and

prescribed medications, shall be followed by the Site Medical Director for the first three months, following which they will be placed into a Chronic Care Clinic and scheduled to be evaluated by the Medical Director/designee at a minimum of every six months.  (*Id.* at ¶ 34).

      **C.**    **Teeter's Treatment**

Upon entering into DOC custody on April 27, 2015, Teeter presented with a GD diagnosis and reported that she had taken hormone replacement treatment and testosterone blockers prior to incarceration.  (Doc. 36-1, ¶¶ 2, 3; Doc. 47, ¶ 11).  DOC medical staff reviewed and confirmed the diagnosis.  (Doc. 47, ¶ 11).  On October 9, 2015, Andrew Dancha, D.O. discussed with Teeter her GD diagnosis, advised her of the side effects of hormone therapy treatment, and agreed upon a plan of prescribed hormone therapy which initially consisted of a prescription for 30mg of estradiol to be administered on the first and fifteenth each month, for a total of 60mg each month with hormone levels to be checked every three months. (Doc. 36-1, ¶ 6; Doc. 47, ¶¶ 12, 13).

Through the DOC's Chronic Care Clinic, Teeter receives regular assessment and treatment, including blood work and testing to determine estrogen and testosterone levels.  (Doc. 47, ¶¶ 14, 15)**.**  Between the initial prescription and July

2018, her hormone levels were checked regularly and adjusted as needed. (Doc. 36-1, ¶¶ 7-31).

On July 6, 2018, Defendant Kollman modified Teeter's dosage to 20 mg of estradiol to be administered on the first and fifteenth of each month, for a total of 40 mg each month. ( Doc. 36-1, ¶ 32; Doc. 47, ¶ 16). Defendant Kollman again saw Teeter on September 10, 2018 in the Chronic Care Clinic; no changes were made. (Doc. 36-1, ¶ 33).

On November 15, 2018, Teeter submitted an inmate request form to Defendant Kollman inquiring about the change in dosage. (*Id.* at ¶ 19). Defendant Kollman informed her that the hormone dosage had not been changed since July of 2018. Defendant Kollman also explained that the lab results indicated her estrogen level was "above goal and testosterone level below goal," and that he could have reduced the dosage further, but chose not to do so at that time. (*Id.* at ¶ 20).

On November 29, 2018, Teeter submitted an inmate request form to Defendant Boland, expressing concerns about her current hormone dosage. (*Id.* at ¶ 21). In his response, Defendant Boland informed Teeter that he discussed her concerns with Defendant Kollman, who informed him that the dosage had not been adjusted since July of 2018 and that, according to DOC guidelines, the lab results indicated that the current dosage was correct. (*Id.* at ¶¶ 22, 23).

Teeter submitted Grievance Number 778458, regarding her request to have her hormone dosage modified to the prior dosage of 60mg/month. (*Id.* at ¶ 23). In denying the grievance, Registered Nurse Supervisor ("RNS") Lisa Campbell ("RNS Campbell"), noted that a review of Teeter's lab results from March 2018 through September 2018, revealed an increase in her estrogen levels and her testosterone levels continued to decrease, following the reduction in estrogen in July of 2018. She further noted that "pursuant to DOC policy 13.2.1, Section 19, WPATH serves as the guideline for overall healthcare; however, the UpToDate software program will be utilized by the Medical Director for guidance regarding selecting medications and determining the dosage." (*Id.* at ¶¶ 25, 26). She reminded Teeter that she will continue to be seen in Chronic Care Clinic for GD and that Dr. Kollman will continue to monitor and adjust her medication as he deems medically necessary. (*Id.* at ¶ 27). RNS Campbell also stated "there is no evidence that Dr. Kollman is negligent in the care provided to you, is not following policy or has decreased your estrogen dosage to a dangerous level as you claim." (*Id.* at ¶ 28). The denial of the grievance was upheld on all levels of appeal and on final review the Secretary's Office of Inmate Grievances and Appeals determined that Defendant Kollman provided reasonable and appropriate medical care. (*Id.* at ¶ 29).

On January 18, 2019, Teeter informed psychologist James Thurston ("Thurston") that she was experiencing stress due to physical complications with her gender transition and incorrect dosing of her estrogen shots. (Doc. 36-1, ¶ 35). On February 19, 2019, she reported to psychiatrist Shella Khatri, MD that she was upset about the decrease in her hormone but denied experiencing any psychiatric symptoms or need for medications. (*Id.* at ¶ 37). She reported that she was sleeping and eating fine, and denied experiencing depression, anxiety, or mood swings. (*Id.*).

On March 12, 2019, at Chronic Care Clinic, Teeter reported to Defendant Kollman that she was having night sweats and nocturnal erections and claimed that her condition had worsened. (*Id.* at ¶ 38). Defendant Kollman noted that Teeter's labs were now closer to goal and scheduled a follow-up appointment with Chronic Care Clinic in six months. (*Id.*).

On March 18, 2019, Thurston evaluated her for Z Code (single cell housing accommodation) continuation. (*Id.* at ¶ 39). He recommended continuation of the in Z Code as Teeter appeared and identified as a female. (*Id.*).

On August 27, 2019, Defendant Kollman reviewed Teeter's chart and renewed her estradiol. (*Id.* at 40).

## IV.  DISCUSSION

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  *See* 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.; see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002*); Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under §1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs.  *Id.* at 104-05. To succeed on such a claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'"  *Pearson v. Prison Health Serv.*, 850

F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

### A. Defendant Boland

Defendant Boland seeks an entry of summary judgment based on a lack of personal involvement. Individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." *Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003); *Rode*, 845 F.2d at 1207-08. A plaintiff must establish the particulars of conduct, time, place, and the person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of or personal involvement in the deprivation of his or her rights, individual liability will not follow. *Atkinson*, 316 F.3d at 271; *Rode*, 845 F.2d at 1207-08.

Defendant Boland argues that he is a registered nurse, not a doctor and that "Pennsylvania's Professional Nursing Law, 63 P.S. § 211 *et seq.*, prohibits nurses

from providing medical diagnoses or prescribing medical, therapeutic or corrective measures. 63 P.S. § 212; *Corrigan v. Methodist Hospital*, 107 Fed. Appx. 269, 272 (3d Cir. 2004); *Earls v. Sexton*, 2010 WL 2179627, *1 (M.D. Pa. May 28, 2010) (a nurse may not make a diagnosis as part of their employment). Therefore, [he] is statutorily precluded from making a medical diagnosis and prescribing medical or corrective measures." (Doc. 47, p. 5). In a Third Circuit non-precedential opinion, in arguing that its nursing staff could not be liable to plaintiff, a medical provider directed the court to Pennsylvania's Nursing Regulations. *See Boomer v. Lewis*, 541 F. App'x. 186, 192 n.6 (3d Cir. 2013) (noting that PrimeCare's nurses "point out in their brief, there is a limit to what treatment they are allowed to provide under Pennsylvania's Professional Nursing Law, 63 P.S. § 211 *et seq. See, e.g.*, 63 P.S. § 212(1) (disallowing 'medical diagnosis or prescription of medical therapeutic or corrective measures' ")).

He further argues that his role is administrative in nature and that he is not involved with the inmates' day-to-day medical care. As noted *supra*, the DOC policy defines the CHCA's role with respect to inmates diagnosed with GD as purely administrative. As such, Boland contends that he was not personally involved with Teeter's medical care and lacked the ability to alter the hormone therapy prescribed by her treating physician. (Doc. 46, p. 6).

15

It is undisputed that, as a nurse, Boland is prohibited from providing medical diagnoses or prescribing medical, therapeutic, or corrective measures. The fact that his role was limited to administerial duties is also uncontested. The record is devoid of evidence that Defendant Boland had any personal involvement in the adjustment of Teeter's estrogen dosing or any involvement in her overall medical care. Accordingly, he is entitled to an entry of summary judgment.

### B.     Defendant Kollman

It is undisputed that Teeter had serious medical needs as an individual with GD. At issue is whether Kollman acted with deliberate indifference in treating Teeter's GD and in relying on the UpToDate software in adjusting her estrogen dosage. Deliberate indifference occurs when prison officials "intentionally deny[ ] or delay[ ] access to medical care or interfer[e] with the treatment once prescribed." *Pearson*, 850 F.3d at 534 (quoting *Estelle*, 429 U.S. at 104-05). A mere complaint "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment[.]" *Estelle*, 429 U.S. at 106. Moreover, "mere disagreement as to the proper medical treatment does not support a claim of" deliberate indifference. *Pearson*, 850 F.3d at 535 (internal quotations omitted). Rather, where there has been medical care, "we presume that the treatment of a prisoner is proper absent

16

evidence that it violates professional standards of care." *Id.* As long as a physician exercises professional judgment, his or her behavior does not violate an inmate's constitutional rights. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).

No reasonable factfinder could conclude from the record before us that Defendant Kollman acted with deliberate indifference. On every occasion Teeter presented for treatment at the Chronic Care Clinic, Kollman conducted necessary tests and assessments and rendered treatment, prescribed medication, and offered medical advice. There is not a single instance where Teeter sought medical attention and was denied. Her main argument, that he adjusted her hormone therapy dosage in accordance with the guidance provided by the UpToDate software, in contravention of DOC policy and WPATH directives, has no support in the record. In fact, the record clearly establishes that WPATH does not describe or endorse a particular hormone regimen. WPATH strongly recommends that medical providers administering hormone therapy "regularly review the literature for new information and use those medications that safely meet individual patient needs with available local resources." (Doc. 36-1, ¶¶ 44, 45; Doc. 47, ¶¶ 39-41). Finally, the DOC's Access to Health Care Procedures Manual, 13.2.1, Section 19 (Diagnosis and Treatment of Gender Dysphoria), Part D(2) states, "Up-To-Date

will serve as guidelines for the specific medical treatment of inmates who require hormone therapy."

Teeter's claim amounts to a "mere disagreement as to the proper medical treatment." *Lanzaro*, 834 F.2d at 346. It is clear that professional judgment was exercised by Defendant Kollman in addressing Teeter's GD and rendering her treatment while in his care. As such, we are precluded from finding that he acted with the "obduracy and wantonness" necessary to sustain an Eighth Amendment violation, *see Whitley v Albers*, 475 U.S. 312, 319 (1986). Defendant Kollman is entitled to an entry of summary judgment.

## V.   CONCLUSION

Based on the foregoing, Defendants' motions (Docs. 36, 45) for summary judgment are deemed unopposed and will be granted.

A separate Order will issue.